Filed 2/13/15  Tower Lane Properties v. City of Los Angeles

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| TOWER LANE PROPERTIES, INC., | B251742 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS141623) |
| v. | |
| CITY OF LOS ANGELES, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard Fruin, Judge.  Affirmed.

Jeffer, Mangels, Butler & Mitchell, Robert E. Mangels, Benjamin M. Reznik, Matthew D. Hinks for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney, Michael J. Bostrom and K. Lucy Atwood, Deputy City Attorneys for Defendants and Respondents.

_____

Appellant Tower Lane Properties (Tower) sought building and grading permits from respondent City of Los Angeles (the City) for construction of a three-residence family compound over three contiguous lots in Benedict Canyon, an area on the Westside of the city. The City's Planning Department refused to clear a condition to issuance of the permits on the ground that a precondition—installation of a secondary access road—had not been satisfied. Tower petitioned the Los Angeles Fire Department (LAFD) to accept substitute fire prevention measures in lieu of a secondary access road, which the LAFD did, subsequently recommending to the Planning Director that the precondition could be cleared. The Planning Department declined to follow the LAFD's recommendation, instead informing Tower that any waiver or modification of the secondary access road precondition must be obtained from the Planning Department, not the LAFD.

Tower refused to seek a waiver or modification of the precondition from the Planning Department, but instead instituted these writ proceedings against the City and several city employees, contending the City owed a ministerial duty to issue building and grading permits because the access road precondition had been satisfied, as evidenced by the LAFD's willingness to accept supplemental fire prevention measures in lieu of a secondary access road and by the City's having waived the precondition for a prior owner. In essence, Tower alleged the Planning Department owes a ministerial duty to accept LAFD recommendations regarding private streets or is at least estopped from enforcing a precondition that in the past had gone unenforced.

The trial court sustained the City's demurrer to the petition without leave to amend, finding the City owed no ministerial obligation to clear an unsatisfied precondition.

We affirm. The Los Angeles Municipal Code provides that waiver or modification of a street approval condition, which is itself a precondition to issuance of a building permit, must be obtained from the Planning Department. Tower admits it refuses to seek a waiver or modification from that department.

**Background**

Tower appeals from a judgment of dismissal entered after the sustaining of a general demurrer.  Accordingly, we assume the truth of facts properly pleaded in or attached to the complaint and may consider judicially noticeable matters.  (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.)

1.    *History of the Property*

The property at issue comprises three contiguous lots on approximately five and a half acres fronted by Tower Lane, a private street in the Benedict Canyon neighborhood of Los Angeles.  The lots bear the addresses 9933, 9937 and 9941 West Tower Lane.  We will refer to them collectively as "the property" and individually by their respective address numbers.  Tower Lane is designated in city records as "Private Street Number 275B," or "PS 275-B."

Originally developed in the 1920's, the property was the site of the estate home of King Vidor, a noted film director.  In 1966, Tower Lane (the street), which until then had provided no access to the property, was extended to access lots 9933 and 9937 but not 9941, which could be accessed only by means of a driveway running through lot 9937.

In 1998, to comply with regulations requiring that all lots front an approved street for at least 20 feet, the owner of the property adjusted the line between lots 9937 and 9941 to bring a portion of lot 9941 down to Tower Lane.  Although the street itself was not changed, its official description was modified to reflect that the street now served three lots rather than two.

In 2000, the Planning Department issued a letter stating the department approved modification of Tower Lane and would advise the Building and Safety Department that necessary permits could be issued following compliance with 16 conditions.  The 16 conditions concerned such matters as utility easements and compliance with building standards.  (A copy of the 16 conditions is attached as appendix A, *post*, page 24.)  Conditions 9 through 15, which the Planning Department imposed at the recommendation of the LAFD, dealt with emergency vehicle access and fire hydrants.  This litigation concerns the twelfth condition.

3

Condition No. 12 stated: "Fire Lanes, where required, and dead-ending streets shall terminate in a cul-de-sac or other approved turning area. No dead-ending street or fire lane shall be greater than 700 feet in length or secondary access shall be required."

The City Planning Department determined Tower Lane was a dead-end street longer than 700 feet.

In 2002, the City issued a "Certificate of Compliance" for the 9937/9941 Tower Lane boundary adjustment. The certificate stated, "The purpose of filing this Certificate of Compliance is to verify that all necessary deeds to adjust the boundaries of the subject parcel have been approved and recorded . . . . [¶] This certificate relates only to issues of compliance or noncompliance with the Subdivision Map Act and local ordinances enacted pursuant thereto. The parcel described herein may be sold, leased, or financed without further compliance with the Subdivision Map Act or any local ordinance enacted pursuant thereto. Development of the parcel may require issuance of a permit or permits, or other grant or grants of approval."

In 2005 and 2006, the then-owner demolished King Vidor's home, carried out some grading on the site, constructed a long retaining wall, and constructed a large underground parking facility on lot 9941, atop which a new residence would be constructed. In relation to these activities the owner sought building and grading permits from the City, which cleared Condition No. 12 and issued the permits.

2. *Tower Sought Building and Grading Permits for Additional Construction*

Tower purchased the property in 2009. Two years later, it submitted project plans and applications for grading and building permits for 35,452 square feet of residential construction, including a new single-family dwelling, garage and two new retaining walls on lot 9933; a new single-family dwelling with attached garage, two retaining walls, and two water features on lot 9937; and a new two-story single-family dwelling, with basement, to be located atop the subterranean garage, a two-story accessory living quarters building, a pool and spa, a pool cabana building, and a pool service and equipment building. The grading activities on each lot were expected to result in the

4

export of 52 cubic yards of earth from lot 9933, 671 yards from lot 9937, and 246 yards from lot 9941, for a total of 969 cubic yards of earth removed.

In lieu of a secondary access road as required by Condition No. 12, Tower proposed to install a stairway from Delresto Drive, immediately to the west of the property, across an ingress-egress utility easement.

During the permit review process, city departments cleared most of the conditions for the permits Tower sought, but in July 2012 the Planning Department informed Tower it would not certify Tower Lane itself—thereby precluding issuance of building permits by the Department of Building and Safety—unless building plans satisfied Condition No. 12. Respondent Jim Tokunaga, a Senior City Planner in the Planning Department, directed Tower to obtain approval from the LAFD of its plans to satisfy Conditions 9 through 15.

On October 17, 2012, Mark Stormes, a Fire Marshal with the City's Bureau of Fire Prevention and Public Safety, issued an inter-departmental memorandum to the Planning Director stating the LAFD had investigated Tower's property and reviewed and approved its plans. Stormes recommended that the Planning Department clear Conditions 9 through 15.

The Planning Department declined to follow the LAFD's recommendation with respect to Condition No. 12. Instead, on November 7, 2012, respondent Michael LoGrande, the Planning Director, issued an inter-departmental memorandum to the Department of Building and Safety stating no permits could issue because Tower's plans failed to satisfy Condition No. 12. LoGrande stated that if Tower wanted a waiver or modification of Condition No. 12, it must apply to the Department of Planning for one, which would require that Tower Lane repeat the approval process and undergo environmental review.

3.  *Tower's Petition for Writ of Mandate*

Rather than seek a waiver or modification of Condition No. 12, Tower sued. On February 5, 2013, it filed a petition and complaint against the City, Tokunaga, LoGrande, and Jeffrey Duran, a building inspector, seeking a traditional writ of mandate pursuant to

5

Code of Civil Procedure section 1085 and damages under the federal Civil Rights Act (42 U.S.C. § 1983) for violation of its due process and equal protection rights. Tower alleged the City had a ministerial duty to clear Condition No. 12 because: (1) Its plans provided for secondary access by way of a staircase from an adjacent road across a utility easement; (2) the LAFD recommended that Condition No. 12 be cleared; and (3) the City's longstanding practice was to follow LAFD recommendations. Tower alleged the City and city officials violated its constitutional rights by treating it differently from other property owners and developers and denying permits to which it was entitled. It alleged that on multiple occasions the City cleared conditions to Tower's permits only to later remove the clearances or impose additional requirements at the behest of wealthy neighbors who were opposed to Tower's proposed construction. For example, requirements related to a watercourse and site drainage were originally cleared, but later "uncleared," or additional requirements were added. After Tower began construction to fix a wall incorrectly built by its predecessor, respondent Duran, an inspector in the City's Department of Building and Safety, issued a stop work order and informed Tower that work could not resume until it obtained a tentative tract map, a requirement the City had waived for every other property owner. Tower alleged the roadblocks to its construction originated with Bruce and Marsha Karsh, wealthy neighbors opposed to the construction, with whom Tokunaga, LoGrande, and Duran conspired to defeat the project. Tower sought compensatory damages of at least $25 million, punitive damages, a declaration that the City was "estopped from denying" that the project satisfies Condition No. 12 and related conditions, and a writ of mandate commanding the City to clear all conditions and issue Tower's permits "forthwith."

The City, LoGrande, Tokunaga, and Duran demurred to the petition and complaint, arguing Tower's allegations were insufficient to state a mandate claim because the City had no ministerial duty to clear an unsatisfied street approval condition. LoGrande, Tokunaga, and Duran further argued Tower's federal civil rights claim failed to state a cause of action, and at any rate they were entitled to qualified immunity under federal law.

6

The trial court sustained the demurrers without leave to amend, finding that because Tower's plans failed to satisfy Condition No. 12, the Planning Department was not obligated to approve Tower Lane, which meant the Building and Safety Department was not obligated to issue building or grading permits. Tower's causes of action for denial of due process and equal protection necessarily failed too because no constitutional right had been violated and, in any event, city officials were entitled to qualified immunity under federal law.

Tower timely appealed from the resulting judgment of dismissal.

## Discussion

### A. Standard of Review

When a demurrer is sustained, we review the complaint de novo to determine whether it alleges facts stating a cause of action under any legal theory. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.) "A demurrer tests the legal sufficiency of factual allegations in a complaint. [Citation.] In reviewing the sufficiency of a complaint against a general demurrer, this court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. This court also considers matters that may be judicially noticed." (*Id*. at pp. 42-43.) We may "disregard allegations which are contrary to law or to facts which may be judicially noticed [citation] or which are contradicted by the express terms of an exhibit incorporated into the complaint." (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 180.) Finally, we independently construe the meaning of statutes as a question of law. (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869-870.)

"[W]hen [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) A petitioner or plaintiff has the burden to show what facts it could plead to cure existing defects in the petition or complaint. (*Ibid.*; *Total Call Internat., Inc. v. Peerless Ins. Co.* (2010) 181

7

Cal.App.4th 161, 166.) To meet this burden on appeal, the petitioner or plaintiff must "enumerate facts and demonstrate how those facts establish a cause of action." (*Ibid.*)

A writ of mandate may be issued by any court "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) A writ of mandate may not be issued to compel the exercise of discretion in a particular manner. (*Helena F. v. West Contra Costa Unified School District* (1996) 49 Cal.App.4th 1793, 1799.) There are two essential requirements to obtain a writ of mandate: (1) a clear, present and usually ministerial duty on the part of the respondent, and (2) a clear, present and beneficial right in the petitioner to the performance of that duty. (*Mission Hospital Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 478-479; *California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 704.)

The Los Angeles Municipal Code (LAMC) specifically enjoins the issuance of a building permit by the Building and Safety Department when a project conforms with the LAMC and other relevant codes and ordinances and appropriate fees have been paid. (LAMC, § 91.106.4.1.)[1]

**B.      Tower's Project did not Comply with the LAMC**

Tower argues the City has a ministerial duty to issue the permits it seeks because its project conforms with all applicable codes and ordinances. We disagree.

1.      *LAMC Requirements*

Article 8 of chapter I of the LAMC governs lots or building sites that are contiguous or adjacent to private streets. (LAMC, § 18.00 et seq.) Section 18.03 requires that prior to the issuance of any building permit for a building site on a private street, a private street map containing information about the street, the surrounding area, and any associated lots must be approved by the Planning Director. Section 18.10 states that

---

[1] LAMC section 91.106.4.1 provides in pertinent part: "When the department determines that the information on the application and plans is in conformance with this Code and other relevant codes and ordinances, the department shall issue a permit upon receipt of the total fees." LAMC section 91.105.5.4 identifies "the department" as the Department of Building and Safety.

8

"[n]o building permits shall be issued for the erection of buildings on lots or building sites which are contiguous or adjacent to private streets" unless the following requirements have been met:  (1) a private street map has been "approved and written findings made as to the conditions of approval thereof"; and (2) the Planning Director has certified that "the conditions, if any, required by said written findings have been fulfilled in a satisfactory manner . . . ."  The Planning Director may grant a modification to the private street requirements only if "necessary because of the size, use, physical or other conditions" of the property.  (LAMC, §§ 18.01, 18.10, 18.12, 12.03.)

In 2000, pursuant to a lot line adjustment, the City conditionally approved a modification to a private street map to reflect that Tower Lane now served three lots rather than two.  The conditional approval stated, "The Deputy to the Director of Planning will advise the Department of Building and Safety that the necessary permits may be issued pursuant to this approval following receipt of satisfactory evidence of compliance with [16] conditions," including the following:  "No dead-ending street or fire lane shall be greater than 700 feet in length or secondary access shall be required." In a Planning Department memorandum of which we may take judicial notice because it is attached to the complaint, the City determined the private street granting access to Tower's properties was a dead-end street longer than 700 feet.  Thus, to obtain the requested permits, Tower must demonstrate compliance with Condition No. 12 or be granted a modification at the discretion of the Planning Director.  (See LAMC, § 18.12.)

Condition No. 12, imposed by recommendation of the LAFD, comes directly from the Los Angeles Fire Code.

(On January 10, 2014, the former Los Angeles Fire Code was repealed and replaced with a new code, one that adopts by reference the California Fire Code (Cal. Code Regs., tit. 24, pt. 9) and portions of the 2012 version of the International Fire Code (a model code), with certain "exceptions, modifications and additions."  (LAMC, §

9

57.101.)[2]  The California Fire Code itself is "Based on the 2012 International Fire Code." (Cal. Code Regs. tit. 24, pt. 9 (tit. p.).)[3]  The pertinent provisions of the former and current Los Angeles Fire Codes are identical for our purposes.)

The Los Angeles Fire Code mandates that an approved fire apparatus access road be provided for and extend to within 150 feet of all portions of the exterior walls of the first story of every building constructed in the jurisdiction.  (LAMC, § 57.503, adopting the Intl. Fire Code, § 503.1.1; see Cal. Fire Code, § 503.1.1.)  When such "access is provided by an improved street . . . which results in a dead-end in access [*sic*: excess] of 700 feet in length from the nearest cross street, at least one additional ingress-egress *roadway* shall be provided in such a manner that an alternative means of ingress-egress is accomplished."  (LAMC, § 57.503.1.5, italics added; former § 57.09.03.)  "Roadway" is defined as "the portion of the street intended for use by vehicular traffic, including parking lanes."  (LAMC, § 62.00.)

In short, no building permit may issue for construction on a private street absent satisfaction of conditions of the street's approval or waiver thereof.  (LAMC, § 18.10.)  A secondary access road was a condition of Tower Lane's approval.

2.      *Tower's Complaint*

Tower's complaint reveals on its face that Tower's building plans failed to satisfy Condition No. 12.  Tower did not allege a secondary access road existed or was planned, as required by Condition No. 12.  Instead, it alleged its plans provided for secondary access via a staircase across a utility easement.  This does not suffice.  Although Condition No. 12 itself states only that "secondary access" need be provided, the Fire Code section upon which the condition was modeled clearly requires that secondary access be achieved by means of an "ingress-egress roadway."  (LAMC, § 57.503.1.5.)

---

[2] The California Fire Code may be found at <http://www.ecodes.biz/ecodes_support/Free_Resources/2013California/13Fire/13Fire_main.html> (as of Feb. 4, 2015).

[3] The International Fire Code may be found at <http://publiccodes.cyberregs.com/icod/ifc/2012/index.htm> (as of Feb. 4, 2015).

Therefore, the City had no duty to issue the permits Tower sought, and a writ of traditional mandate will not lie.

3.    *Certificate of Compliance*

Tower argues the City must clear Condition No. 12 because the 2002 certificate of compliance established the condition had been satisfied.  The argument is without merit.

A person owning real property may request a determination whether the property complies with the Subdivision Map Act and local ordinances enacted pursuant to it. (Gov. Code, § 66499.35, subd. (a).)  If a local agency determines the real property complies, it shall cause a certificate of compliance to be recorded.  (*Ibid.*; Gov. Code, § 66499.35, subd. (a); *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996-997, fn. omitted.)  A certificate of compliance thus reflects only that a lawful parcel exists, not that conditions required for development on the parcel have been satisfied.

Accordingly, the certificate here stated it pertained "only to issues of compliance or noncompliance with the Subdivision Map Act and local ordinances enacted pursuant thereto," not to development permits.  On the contrary, the certificate expressly disclaimed any dispositive effect as to development permits by providing that "[d]evelopment of the parcel may require issuance of a permit or permits, or other grant or grants of approval."  According to the plain language of the certificate, the prior owner obtained approval only to adjust boundaries, not to obtain construction permits.[4]

4.    *LAFD's Recommendation*

Tower contends the City must issue building and grading permits because the LAFD cleared Condition No. 12.  The argument is without merit.

---

[4] In rebuttal, Tower cites the City's purportedly inconsistent position in a related case brought against it by project opponents, in which the City contends the certificates "conclusively established the lots have legal access."  (*Concerned Citizens of Benedict Canyon v. City of Los Angeles* (B251227, app. pending) (Super. Ct. L.A. County, 2013, No. BS140952).)  Assuming for the sake of argument that the City's position in other litigation is relevant here, that position is not inconsistent with the one it takes here.  In both lawsuits, the City contends the lots are legal as parcels, but even a legal parcel may be subject to conditions that restrict development on it.

11

Article 8 of chapter I of the LAMC vests authority over private street approval in the Planning Director. (LAMC, §§ 18.02, 18.03, 18.08, subd. (A)(1), 18.10, 18.12; see § 12.03 [identifying "Director" as the Director of Planning in the Department of City Planning].) LAMC section 18.03 states that the Planning Director "shall not act on any Private Street Map until he receives a report thereon from . . . the Fire Department," but ultimately sole authority to "approve, conditionally approve or disapprove the map" rests with the director. (LAMC, § 18.08, subd. (A)(1).) LAMC section 18.10 requires that the Planning Director certify to the Department of Building and Safety that the conditions of approval of the private street map have been fulfilled in a satisfactory manner and that a permit may be issued. LAMC section 18.12 provides that a builder who wishes to deviate from the requirements associated with a private street approval must seek modification of the requirements from the director. (LAMC, § 18.12.) In short, the statutory scheme grants sole authority over private street approvals and associated conditions to the Planning Director. Although the LAFD may recommend that a condition be imposed and later that it be cleared, it has no jurisdiction over private street approvals or associated building permits and its recommendations do not supersede the Planning Director's authority.

5. *Prior Permits*

Tower argues the City issued building and grading permits for construction on the property in 2005 and 2006, which demonstrates the private street approval and associated conditions had been satisfied. It argues it relied on those permits in purchasing the properties and expending tens of millions of dollars to obtain permits to develop them. Therefore, it argues, the City is precluded from denying that Condition No. 12 has been satisfied. The argument is without merit.

First, the construction pursued by the prior owner in 2005 and 2006 was nothing like Tower's proposed construction. The prior owner demolished a house, constructed a retaining wall and installed a subterranean garage. Tower proposes to construct six retaining walls, four houses, three water features, two aboveground garages, and two auxiliary buildings, and to remove almost 1,000 cubic yards of earth.

12

It is undisputed no secondary access road was created by the prior owner, but arguably none was needed. The Los Angeles Fire Code mandates that an approved fire apparatus access road be provided for and extend to within 150 feet of all portions of the exterior walls of the first story of every *building*, and when that access is provided by a long, dead-end street, secondary access is required. Nothing in the Fire Code suggests secondary fire access is necessary when no building is served by the primary access, but only a retaining wall, demolished house, or empty subterranean garage. It is therefore unsurprising (and of no moment) that the City required no secondary road to access property that as yet contained no building, or to await construction of a residence before insisting that the road be installed. Even if, as seems sensible, secondary fire access *is* required when long, dead-end primary access reaches a subterranean garage,[5] the City would have been within its discretion to delay imposition of Condition No. 12 until such time as construction was proposed that would result in the garage coming into use. The City's refusal to insist on a secondary road at a time when no such construction was proposed neither reflects that Condition No. 12 was satisfied nor obligates the City to forever waive it.

Even assuming the prior owner was obligated to comply with Condition No. 12 but the City wrongfully failed to insist that a secondary road be installed, the City would still not be obligated to repeat the failure. "When a statute prescribes the particular method in which a public officer, acting under a special authority, shall perform his duties, the mode is the measure of the power." (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1563.) "No government, whether state or local, is bound to any extent by an officer's acts in excess of his authority. [¶] One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government for which he is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power

_____

[5] After all, a fire can occur in an underground garage.

13

expressly granted." (*Id*. at pp. 1563-1564.) At best, the City failed to enforce Condition No. 12 against the prior owner. No principle supports Tower's suggestion that the failure must be repeated.

Second, the City cannot be estopped from enforcing a condition to street approval even if it has declined to do so in the past. (Tower denies it is making an estoppel argument, and it expressly disclaims any appeal from the sustained demurrers to its third cause of action, which was for estoppel, but the essence of the argument is that because Tower relied on the City's prior conduct when purchasing the property, the City cannot now reverse course. That is an estoppel argument.)

The doctrine of estoppel in the land use context, "prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer incurs substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive the developer of the right to complete the development as proposed." (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321.) "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.)

But estoppel against a government entity in a land use case requires an additional element: The injustice that would result from failure to uphold an estoppel must be so great as "to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497.) "[W]here even one of the requisite elements for estoppel is missing, [estoppel] does not apply." (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360.)

A party "faces daunting odds in establishing estoppel against a governmental entity in a land use case" because it may "not be invoked against a government agency where it would defeat the effective operation of a policy adopted to protect the public."

14

(*Toigo v. Town of Ross*, *supra*, 70 Cal.App.4th at p. 321; *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813, 822.)  In land use disputes, "we are dealing with a vital public interest—not one that is strictly between the municipality and the individual litigant.  All the residents of the community have a protectable property and personal interest in maintaining the character of the area as established by comprehensive and carefully considered zoning plans in order to promote the orderly physical development of the district and the city and to prevent the property of one person from being damaged by the use of neighboring property in a manner not compatible with the general location of the two parcels.  [Citation.]  These protectable interests further manifest themselves in the preservation of land values, in esthetic considerations and in the desire to increase safety by lowering traffic volume.  To hold that the City can be estopped would not punish the City but it would assuredly injure the area residents, who in no way can be held responsible for the City's mistake." (*Pettitt v. City of Fresno*, *supra*, 34 Cal.App.3d at pp. 822-823.)

"[P]ublic policy may [also] be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775.)

Accordingly, "in the absence of exceptional circumstances, the doctrine of equitable estoppel will not be applied to allow a landowner to circumvent land use restrictions even when the landowner relies on the public entity's express representation that the landowner's plans comply with the entity's land use requirements . . . ." (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 262.)

"Although estoppel is generally a question of fact, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law." (*Feduniak v. California Coastal Commission*, *supra*, 148 Cal.App.4th at p. 1360.)  Moreover, "[w]hether the injustice [that] would result from a failure to uphold an estoppel is of sufficient dimension to justify the effect of the estoppel on the

15

public interest" is a question of law. (*Smith v. County of Santa Barbara*, *supra*, 7 Cal.App.4th at p. 776.)

Here, Tower seeks to avoid Condition No. 12 by relying on the City's representations—purportedly made in 2000, 2005 and 2006—that the condition had been met and its failure to enforce the condition as to other landowners. But even if the 2002 certificate of compliance and 2005 and 2006 permits demonstrated that the City had previously either determined Condition No. 12 had been met or had been willing to waive it, the City was entitled to reverse course. The fire danger in Southern California is well known. Condition No. 12 was designed to permit access to remote property by emergency vehicles and provide an escape route for non-emergency vehicles in case of fire or other emergency. The measure thus protects a vital and pressing public interest, and cannot be subverted simply because years ago a city employee mistakenly thought secondary access to an area that hosted only an empty subterranean garage would be unnecessary until such time a residence or other occupiable building was constructed.

Tower argues it has a protectable interest in pursuing its construction project. That is not in dispute. But nothing permits Tower to avoid the procedure set forth in LAMC section 18.12 for pursuing its construction. Section 18.12 requires a builder that does not wish to install a secondary access road to obtain a modification of that condition from the Planning Department. The real issue is whether Tower may pursue its construction project without even applying for such a modification. Clearly, it may not.

The residents of Benedict Canyon have an interest in rapid fire response. To hold that the City can be estopped from facilitating emergency access to fires now because it did so in the past "would not punish the City but it would assuredly injure the area residents, who in no way can be held responsible for the City's mistake." (*Pettitt v. City of Fresno*, *supra*, 34 Cal.App.3d at p. 823.)

### C.      Leave to Amend

In sum, the City lawfully required Tower to demonstrate compliance with Condition No. 12 prior to issuing permits. Tower's plans failed to provide for a secondary access road and Tower admits it refuses to seek a modification or waiver of the

16

condition from the Planning Director. Tower therefore failed to allege the City had a ministerial duty to issue the permits.

In the trial court below and at oral argument on appeal, Tower offered to allege and prove a city manual exists which indicates the City interprets certificates of compliance as proof that private street approval conditions have been met. It further offered to allege and prove that no other neighboring property owner has been required to provide secondary vehicular access to its property. Rather, the City has allowed the property owners to provide supplemental fire protection measures in lieu of a secondary access road pursuant to LAFD authorization. Tower argues these facts suggest Condition No. 12 can be substantially satisfied by something other than a road or Tower's proposed staircase over an easement.

Leave to amend an original complaint is rarely denied, as amendment is liberally permitted and we prefer that disputes be resolved on their merits. But "'[l]eave to amend should be denied where the facts are not in dispute, and the nature of the plaintiff's claim is clear, but, under the substantive law, no liability exists.'" (*Kilgore v. Younger* (1982) 30 Cal.3d 770, 781.) The burden is "squarely on the plaintiff" to prove a reasonable possibility exists that a defect can be cured by amendment. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

Tower's offers of proof do not support a legally viable cause of action. Existence of a manual setting forth a city policy that accepts LAFD recommendations and treats certificates of compliance as proof that underlying conditions have been met would be irrelevant. A writ of mandate may be issued only to compel the performance of an act that the law specifically enjoins. The Government Code sets forth the effect of a certificate of compliance, and the LAMC sets forth fire, safety and building regulations that Tower's complaint on its face demonstrates were not complied with. Even if such a policy as is posited by Tower existed, the City would not be bound to follow it and a court could not order it to do so. Tower's proposed amendment would establish only that the City declined to accept the LAFD's recommendations or the strictures of the

17

Government Code, not that a mandatory duty exists under the LAMC to issue Tower's building permits.

Neither would it be relevant if Tower established no other neighboring property owner has been required to provide secondary vehicular access to its property or that the City has allowed supplemental fire protection measures to replace secondary access roads. The issue is not whether other property owners obtained a benefit Tower was denied, the issue is whether Tower may obtain the benefit without even asking for it. It is undisputed the Planning Department enjoys discretion to waive the secondary access requirement, but Tower did not seek a waiver from that department. On the contrary, it maintains it need not do so, as a recommendation from the LAFD suffices. As discussed above, the argument is without merit. (See *Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318 [leave to amend is proper only if there is a reasonable possibility that a complaint's defect can be cured by amendment].)

**D.      Tower's Constitutional Claims**

Tower argues the trial court erred in sustaining demurrers to its causes of action for violation of due process and equal protection under title 42 United States Code section 1983 (section 1983). Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." (42 U.S.C. § 1983.) "The essential elements of a cause of action are, therefore, (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 704.)

To state a section 1983 cause of action a plaintiff must plead more than constitutional "buzzwords." (*Breneric Associates v. City of Del Mar*, *supra*, 69

18

Cal.App.4th at p. 180.) "The plaintiff must allege specific and nonconclusory facts showing the defendant's acts deprived him of a right, privilege or immunity secured by the federal Constitution or federal laws." (*Ibid.*) Mere conclusions are insufficient. (*Catsouras v. Dept. of California Highway Patrol* (2010) 181 Cal.App.4th 856, 891.)

        1.     *Due Process*

"The Fourteenth Amendment due process clause states that no state may 'deprive any person of life, liberty, or property without due process of law.' The procedural component of the due process clause ensures a fair adjudicatory process" before an unbiased decision maker. (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 852; *Morongo Band of Mission Indians v. State Water Resources Control Board* (2009) 45 Cal.4th 731, 737.) But before reaching the issue of the fairness of a particular process, we must first address whether a protected property interest is implicated. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1178.) "If no such interest is involved, then the procedural protections of the due process clause do not come into play." (*Ibid.*)

Similarly, "'a party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution.' [Citations.] If a cognizable property interest is implicated, a court must then determine whether the government's action was arbitrary or irrational" or insufficiently related to any legitimate state interest. (*Clark v. City of Hermosa Beach*, *supra*, 48 Cal.App.4th at p. 1184; *Breneric Associates v. City of Del Mar*, *supra*, 69 Cal.App.4th at p. 184.)

The motivation for the government's decision is irrelevant. (*Breneric Associates v. City of Del Mar*, *supra*, 69 Cal.App.4th at p. 184.) "[W]e must determine not whether a sinister purpose lurked behind" the challenged decision, "but rather whether the development restrictions imposed on the subject property substantially advanced some legitimate state purposes so as to justify the denial of the development permit." (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1022.)

In the land use context, a property owner has a cognizable property interest "only if the owner has 'a legitimate claim of entitlement'" to the permit or approval. (*Las*

19

*Lomas Land Co., LLC v. City of Los Angeles*, *supra*, 177 Cal.App.4th at p. 853; see *Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 577 ["To have a property interest in a benefit, a person . . . must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it"].) A property owner possesses a legitimate claim of entitlement to a permit or approval if "under state and municipal law, the local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval." (*Clark v. City of Hermosa Beach*, *supra*, 48 Cal.App.4th at p. 1180.)

As discussed above, Tower alleged, and offered to allege, no facts that would indicate it was entitled to the permits it seeks.

Tower relies on *Del Monte Dunes at Monterey, Ltd. v. City of Monterey* (1990) 920 F.2d 1496 to argue its allegations state a claim for denial of substantive due process. There, a developer alleged a city council approved the developer's 190-unit project with 15 conditions that the developer substantially met and that city planning staff agreed had been met, yet the city then changed course and rejected the plan, giving only broad conclusory reasons for doing so. (*Id.* at p. 1508.) The case is distinguishable, as here Tower's complaint admits Condition No. 12—a secondary access road—has not been met and the City has never concluded it was met.

Tower does not allege, and offers no reasonable possibility it can allege, that the City deprived it of a protected property interest in violation of due process. On the contrary, Tower admits it refuses to follow the City's process, insisting it need not do so. As discussed, the argument is without merit.

2.    *Equal Protection*

"The federal equal protection clause (U.S. Const., 14th Amend.) . . . provide[s] that persons who are similarly situated with respect to the legitimate purpose of a law must be treated alike under the law." (*Las Lomas Land Co., LLC v. City of Los Angeles*, *supra*, 177 Cal.App.4th at p. 857.) An equal protection claim is sufficient if the plaintiff alleges: (1) the plaintiff was intentionally treated differently from other similarly situated persons; and (2) there was no rational basis for the difference in treatment. (*Id.* at p. 858;

20

see *Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564.) An equal protection claim will fail if "the challenged classification bears a rational relation to a legitimate government objective." (*Breneric Associates v. City of Del Mar*, *supra*, 69 Cal.App.4th at p. 186.)

To satisfy the first element, a plaintiff must allege not only a disparity in treatment but also that the level of similarity between it and the persons with whom it compares itself is extremely high. To be considered similarly situated, comparators must be directly comparable to the plaintiff in all material respects. (*Squires v. City of Eureka* (2014) 231 Cal.App.4th 577, 594-595.) To satisfy the second element, a plaintiff must allege the challenged conduct was so unrelated to the achievement of any legitimate purpose it can only be classified as irrational. (*Stubblefield Construction Co. v. City of San Bernardino*, *supra*, 32 Cal.App.4th at p. 713.)

In its complaint, Tower alleged the City arbitrarily discriminated against it by applying Condition No. 12 differently from the way it applied it to the prior owner. But as discussed above, the prior owner was not similarly situated to Tower because his construction and Tower's were qualitatively different. Tower also generally alleges that other property owners have received waivers from the LAFD, which the City has accepted, but it does not allege those owners' circumstances or whether the waivers concerned private streets or secondary access roads.

Tower offered to allege more detail regarding other property owners who were not required to install secondary access roads, but even this would not suffice. Assuming Tower could allege the City accepted numerous waivers from the LAFD concerning identical conditions on identical property owned by different entities, such would not establish the "asserted unequal treatment was the result of intentional discriminatory conduct, as opposed to mere laxity of enforcement" (*Golden Gate Water Ski Club v. County of Contra Costa*, *supra*, 165 Cal.App.4th at p. 268) or that the City's conduct was so unrelated to the achievement of any legitimate purpose it can only be classified as irrational (*Stubblefield Construction Co. v. City of San Bernardino*, *supra*, 32 Cal.App.4th at p. 713). The City has not refused to modify or waive Condition No. 12. It

21

simply insists no such modification or waiver can come from the LAFD. It is in no wise irrational for a planning department to decline to be constrained by fire department recommendations concerning a building permit.

3.  *Qualified Immunity*

Finally, Tower argues the trial court erred in determining respondent city officials were entitled to qualified immunity. "[Q]ualified immunity shields a public officer from an action for damages under section 1983 unless the officer has violated a 'clearly established' constitutional right." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 840.) "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Saucier v. Katz* (2001) 533 U.S. 194, 202.) In considering a qualified immunity analysis, a court must determine: (1) whether the alleged facts made out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. (*Id.* at pp. 202-203.) "[T]he 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that '"insubstantial claims" against government officials [will] be resolved prior to discovery.' [Citation.] Accordingly, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231-232.) The matter of qualified immunity may be resolved at the pleading stage when the dispositive issue on demurrer does not require a factual resolution. (*Catsouras v. Dept. of California Highway Patrol*, *supra*, 181 Cal.App.4th at pp. 893- 894.)

As discussed above, Tower's allegations failed to establish it has a federally protected property interest. Therefore, no action taken by LoGrande, Tokunaga, or Duran could have violated a "clearly established constitutional right." The city officials were thus entitled to qualified immunity.

E.  **Conclusion**

Underlying Tower's allegations against the City are charges of futility, intransigence, and discrimination, which are precisely the kinds of conduct the writ

22

mechanism was designed to address. But even if the City's actions were guided by nefarious motives rather than legitimate safety concerns, the safety concerns nevertheless exist and a crucial safety condition has not been met. LAMC section 18.12 affords a procedure by which Tower may seek to have the condition modified, but it steadfastly refuses to avail itself of the procedure. A writ will not issue to enable a property owner to spurn an available public remedy and thereby circumvent a vital public safety requirement.

**Disposition**

The judgment is affirmed. Respondent City of Los Angeles is to recover its costs on appeal.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

APPENDIX A

The 16 private street approval conditions were as follows:

"1.     That a minimum 20-foot wide private street easement be provided from Tower Road, including a turnaround area at the terminus satisfactory to the City Engineer.

"2.     That any necessary street, sewer and drainage easements be dedicated to the City.

"3.     That the owners of the property record an agreement stating that they will maintain the private street and the emergency access road, keep the private street and emergency access road[] free and clear of obstructions and in a safe condition for vehicular use at all times.

"4.     That satisfactory arrangements be made with the Power System and the Water System of the Department of Water and Power with respect to water mains, fire hydrants, service connections and public utility easements.

"5.     That the private street be posted in a manner prescribed in section 18.07 of the Los Angeles Municipal Code (Private Street Regulations).

"6.     That a copy of the private street easement and the emergency access road easement be submitted to the City Engineer (Land Development Group) for approval.  An additional copy shall be submitted to the West Los Angeles District Office of the Bureau of Engineering.

"7.     That the requirements in connection with grading and construction in and adjacent to public rights of way or private streets be complied with in a manner satisfactory to the City Engineer.

"a.     Cut or fill slopes should be no steeper than 2:1 (horizontal to vertical).

"b.     The toes and crests of all cut and fill slopes shall be located on private property and shall be set back 2 and 3 feet, respectively, from the property line.

24

"c.     Where fill overlies cut slopes, the fill shall be keyed horizontally into bedrock a minimum width of 12 feet or the slope shall be overexcavated a minimum of 12 feet and replaced as a compacted fill slope.

"d.     The consulting soils engineer shall provide methods of mitigating the effects of expansive soil which may underlie public property and private streets. This method proposed must be approved by the City Engineer prior to the approval of plans.

"e.     All streets shall be founded upon firm, natural materials or properly compacted fill. Any existing loose fill, loose soil, or organic material shall be removed prior to placement of engineered fill.

"f.     Fill material shall be compacted to a minimum of 90 percent relative compaction as defined in the Bureau of Engineering Standard Plan S-610. [F]ill shall be benched into competent material.

"g.     All slopes shall be planted and an irrigation system installed as soon as possible after grading to alleviate erosion.

"h.     Slopes that daylight adversely-dipping bedding shall be supported by either a retaining wall or designed buttress fill.

"i.     Adequate perforated pipe and gravel sub-drain systems approved by the City Engineer shall be placed beneath canyon fills and behind retaining walls.

"j.     Where not in conflict with the above, the recommendations contained in the Pacific Soils Engineering, Inc. geotechnical report dated October 1, 1965, by the consulting geologist, Joseph F. Riccio, PhD, and the consulting civil engineer, Leonard S. Deutsch, RCE 10432, shall be implemented. In addition, the recommendations contained in the Mountain Geology, Inc. supplemental geotechnical report dated February 27, 1998, by the consulting engineering geologist, Jeffrey W. Holt, CEG 1200, and in the West Coast Geotechnical report, dated March 6, 1998, by the consulting civil engineer, Leonard Liston, RCE 31902, shall be implemented.

"8.     That the following improvements be constructed under the permit in conformity with plans and specifications approved by the City Engineer or that the construction be suitably guaranteed satisfactory to the City Engineer.

25

"a.     Grade the private street as required with side slopes satisfactory to the City Engineer.

"b.     Improve the private street by the construction of suitable surfacing to provide a 20-foot roadway, together with suitable improvement of the turning area, and any necessary removal and reconstruction of existing improvements, all satisfactory to the City Engineer.

"9.     Submit plot plans indicating access road and turning area for Fire Department approval.

"10.    The width of private roadways for general access use and fire lanes shall not be less than 20 feet clear to the sky.

"11.    Fire lane width shall not be less than 20 feet.  When a fire lane must accommodate the operation of Fire Department aerial ladder apparatus or where fire hydrants are installed, those portions shall not be less than 28 feet in width.

"12.    Fire Lanes, where required, and dead-ending streets shall terminate in a cul-de-sac or other approved turning area.  No dead-ending street or fire lane shall be greater than 700 feet in length or secondary access shall be required.

"13.    Adequate off-site public and on-site private fire hydrants may be required. Their number and location to be determined after the Fire Department[']s review of the plot plan.

"14.    Private streets and entry gates will be built to City standards to the satisfaction of the City Engineer and the Fire Department.

"15.    Construction of public or private roadways shall not exceed 15 percent in grade.

"16.    That the applicant shall record the necessary deeds to legalize the three lots through Parcel Map Exemption No. 98-054."